## J. V. MATSON ET AL. v. E. JARVIS.

### Decided December 17, 1910.

**1.—Alteration of Written Contract—Release of Obligors—Material Alteration.**

The weight of authority seems to be that an interlineation, erasure or other material alteration in a written contract can not, as a general rule, affect its validity unless the alteration was made after, not before the contract was delivered.

**2.—Same—Consent or Ratification—Evidence.**

In a suit for contribution upon a contract to furnish a railroad company a right of way, and wherein one of the defendants plead that he was released from the contract because the name of another obligor had been erased after said defendant had signed the contract, evidence reviewed, and held to raise a question of fact as to whether or not said defendant consented to or ratified the erasure of the name of the other obligor, and hence the court properly refused a peremptory charge requested by the defendant.

**3.—Excessive Verdict—Miscalculation—Remittitur—Practice.**

When an excessive verdict is shown to be the result of a miscalculation by the jury, a remittitur of the excess will be allowed.

**4.—Contribution—Interest—Charge Approved.**

In a suit by one obligor against others for contribution, charge considered and approved. In the absence of definite evidence by which interest can be computed upon a certain payment, the failure of the jury to include it in their calculation will not be reversible error.

**5.—Same—Insolvency.**

Where it is indisputably shown that the estate of one of the obligors on a bond is wholly insolvent, his pro rata share of the amount due the plaintiff in a suit for contribution must be borne ratably by the other obligors.

**6.—Brief—Insufficient Statements.**

Where assignments of error fail to point out with definiteness the particular error sought to be presented, and are not accompanied by such a statement as will enable the appellate court to decide the question involved without a resort to the record, the assignments will not be considered. Rule illustrated.

Appeal from the District Court of Hill County. Tried below before Hon. W. C. Wear.

*Morrow & Smithdeal,* for appellants.

*E. W. Bounds* and *Vaughan & Hart,* for appellee.

TALBOT, ASSOCIATE JUSTICE.—This is the third appeal in this case.

See 94 S. W., 1079, and 113 S. W., 326. The suit is one for contribution. There is no controversy over the pleadings, and the material facts, among others that will appear in the discussion of the assignments of error, are as follows: On the 21st day of October, 1902, E. Jarvis, the appellee herein, and J. V. Matson, J. M. Carroll and T. C. Morgan, the appellants, and Lee Frisby, W. R. Bounds, J. S. Davis, M. P. Harwood, Jim Jones, Jr., J. M. Peden, W. A. Putman and S. R. Boyd executed a written contract or bond payable to R. H. Baker, in which said parties obligated and bound themselves to procure for the Trinity & Brazos Valley Railway Company the right of way for a certain distance in Hill County, Texas, and as rapidly as the same was required for the construction of said road. The bond or agreement was transferred by Baker to plaintiff Jarvis for a valuable consideration. The signers of this instrument were constituted a right of way committee to procure said right of way, and it was contemplated that the necessary funds with which to secure said right of way would be raised by subscriptions and donations from the citizens of Hill County. The said committee was unable to collect sufficient money by contributions and subscriptions to purchase the right of way as rapidly as was required for the construction of said road, and it became necessary, in order to perform their obligations to R. H. Baker as the representative of said railway company, to secure an advancement or loan of money. The necessary loan or advancement, which amounted to $4000, was obtained from appellee in two separate amounts, namely, $2500 on the 17th day of July, 1903, and $1500 on the 26th day of August, 1903. It was the custom of said committee to execute notes, through such members of the committee as were accessible to sign them, for money advanced to it for the purposes stated, and that sundry such notes were so executed. At the time of advancing the $2500 referred to above, plaintiff took a note for that amount bearing ten per cent interest and falling due November 1 after its date, which bore the following signatures: E. Jarvis (the plaintiff in this suit), W. R. Bounds, J. M. Peden, J. S. Davis, and M. P. Harwood. At the time of advancing the $1500 above mentioned, plaintiff took a note for that amount bearing ten per cent interest and due November 1 after its date, with the same signatures thereto as were attached to the said $2500 note, except the name of the plaintiff Jarvis. The plaintiff Jarvis intended to sign the $1500 note, but through neglect or oversight he did not do so.

The money furnished by plaintiff and evidenced by said notes was furnished on behalf of and for the benefit of the right of way committee, and it was contemplated and expected that said sums were to be repaid to plaintiff Jarvis out of collections made from time to time from subscriptions and contributions, and was not an ordinary loan to the signers of the notes. About August 17, 1905, all of the money that could be collected by contributions and other sources had been received, and on said date a complete statement of the account on the part of said committee with said funds so received and paid out by it, was made, and it was ascertained that appellee had been repaid of said $4000 the

sum of $1375.45, leaving due him by said signers of said contract and bond referred to, the sum of $2629.55. J. E. Clonch also signed said bond, but his name at his request was erased, and W. A. Putman limited his liability thereon to the sum of one hundred dollars. This limitation was not noted on the contract or bond at the time Putman signed the same, but was placed thereon by him the same day he signed the contract and within a few hours, perhaps, thereafter. At the time appellant J. V. Matson signed the said contract or bond the name of J. E. Clonch appeared thereon as one of the obligors, but was afterwards erased without Matson's knowledge or consent, at the time, of the erasure. J. S. Davis died and his widow, Myrtle Davis, was made a party to the suit. S. R. Boyd died insolvent and without making any payment, and the representative of his estate, if he left any, was not sued.

The case was tried before the court and a jury on March 10, 1909. Upon the conclusion of the evidence, it appearing that the defendants, Peden, Davis, Frisby, Jones, Jr., Harwood and Putman, had paid their proportional part of the amount sued for, the court instructed a verdict in their favor and also in Clonch's favor, and submitted the case to the jury as to Matson, Carroll, Morgan and Bounds. The jury returned a verdict in favor of the plaintiff Jarvis for $277.95 against each of these defendants, which amount was reduced by a remittur to $240.39 against each of the said defendants, and from the judgment entered in accordance with such remittitur they have appealed.

The first assignment of error complains of the court's refusal to give the following requested special charge: "You are instructed that it appears from the undisputed evidence that after the right of way agreement, which is set out in plaintiff's petition, was executed by J. V. Matson, that there was a material change in the written instrument, in that the name of J. E. Clonch was erased from said instrument without the consent of the said Matson and without his knowledge. You are therefore instructed that as to the said J. V. Matson the plaintiff has shown no right of recovery, and you will render a verdict in favor of the said J. V. Matson." There is evidence that J. E. Clonch's name was signed to the contract or bond given to secure the right of way for the railway company as an obligor in said bond when Matson signed the bond, and that his name was afterwards erased therefrom without the knowledge or consent of Matson at the time. To this effect was the positive testimony of Matson.

Now, the general rule is that a wilful and material alteration of a written instrument made by one of the parties to it after execution, and without the authority or consent of another party to it, will avoid such instrument as to the non-consenting party. Texas Printing & Lithographing Co. v. Smith, 14 S. W., 1074; Harper v. Stroud, 41 Texas, 367; First Nat. Bank v. Pritchard, 2 Texas Ct. App., Civ. Cas., sec. 130; Wilbarger Co. v. Bean, 3 Texas Ct. App., Civ. Cas., sec. 16. It is also a general rule that any change in the personality, number or relations of the parties to a contract in writing, is a material alteration. 2 Daniel on Neg. Inst., sec. 1387; Harper v. Stroud, *supra;* Parker v.

Glover, 23 Texas, 469. And the erasure of the name of one of two or more obligors in a contract, or makers or drawers or payees of a bill or note who have endorsed the paper, or one of several co-sureties, is likewise a material alteration. There are authorities, however, to the effect, that a material alteration of the instrument, made by one of the parties thereto before its delivery, vitiates the instrument or renders it non-enforceable against the party not consenting to such alteration. But that an interlineation, erasure or other material alteration in a written contract, can not, as a general rule, affect its validity unless the alteration was made after execution and delivery is sustained by the decisions of many of the higher courts of the United States and generally, it seems, by the weight of authority. It is said the policy of the general rules above referred to, is to preserve the integrity of legal instruments by taking away the temptation of tampering with them.

Whether the name of Clonch was erased from the contract or bond involved in this suit, before its delivery and acceptance by R. H. Baker, the obligee, or by whom such erasure was made, the evidence does not clearly show. Clonch testified: "I signed an article that was a guarantee bond on the road, and this is the same article. Esquire Horton presented it to me for signature. I suppose my name was afterwards erased. My instructions were to have it erased. I gave the instructions to S. R. Boyd, who was in Austin at that time. I 'phoned to him. I talked to him about it and he assured me that my name would come off of it. He said that he had the bond, that he had not presented it to Baker, and that my name would be taken off of it before the bond was approved. I did not consult Mr. Jarvis about taking my name off that document. I did not consult anybody except Mr. Boyd. There were some names on that instrument when it was brought to me. I signed just below the last name that appeared on it." Speaking of how long it was after he signed the bond before his name was erased, he said: "I suppose it was done the second day afterwards. I don't know who did it. I did not do it myself. Mr. Boyd assured me that he would do it."

But whether the general rule stated, or the rule that a material alteration made before the delivery renders the instrument void as to the party thereto not consenting, is applicable in the present case, need not be decided; nor do we regard it necessary to determine upon whom the burden of proof rested to explain the alleged alteration of the instrument made the basis of the suit. It may be said, however, that when the alteration is apparent on the face of the instrument, the authorities hold with great unanimity that the party offering such instrument in evidence and claiming under it, is bound to show that the alteration was made under such circumstances that it does not affect his right to recover.

The view we take of the case at bar is, that the court did not err in refusing the charge made the basis of the assignment of error under consideration, for the reason that said charge ignored testimony offered tending to show that the appellant Matson had consented to or ratified

the erasure of Clonch's name from the guarantee bond or contract upon which appellee's right to recover is based, and peremptorily instructed a verdict in Matson's favor. It seems to be well settled that a party to an instrument may ratify or consent to an alteration of it after it has been made, without a new consideration therefor. Grimstead v. Briggs, 4 Iowa, 559; King v. Hunt, 13 Mo., 97; Pelton v. Prescott, 13 Iowa, 567. And a subsequent ratification of the alteration will be equivalent to an original authority to make it. Humphrey v. Guillow, 13 N. H., 385. Such consent to or ratification of the alteration need not necessarily be shown by positive or direct testimony. It may be implied from, or made to appear by circumstances. J. E. Clonch testified: "I have had several conversations with several of these gentlemen whose names are on there (the bond) about it (his name) being erased. My best recollection is that it was in March or April, in Waco, Texas, at a restaurant that Mr. Matson for the first time asked me about having erased my name from the bond. . . . I think that it was in March or April, somewhere along there in 1903."

After stating that Clonch's name was on the bond at the time he signed it, and that he had not authorized anyone to erase it from the bond, and that he did not know it was going to be erased, appellant Matson testified: "I remember being in Waco, Texas, in a restaurant with Mr. J. E. Clonch; I don't remember the date of that occasion. . . . I think the first time I learned about his signing the document (the bond) and erasing his name afterwards, was possibly from Mr. Daniel. I know I questioned Mr. Clonch that day about it. I can not recall the dates as to how long after I signed the right of way agreement before I had conversation with Mr. Daniel. . . . Prior to meeting Mr. Clonch at Waco I had not conversed with him about the fact that he had taken his name off that document. . . . S. R. Boyd and Mr. Davis brought that document to me. They are both dead. I can not recall any reason why I had not talked to Clonch about it (erasure of Clonch's name from bond) before I saw him in Waco. I remember distinctly of talking to him at Waco and asking him all the questions about it. I can not recall the dates or the month or season of the year that I did talk to him at Waco. . . . After Mr. Daniel told me about the change that had been made in the agreement (the bond) I did not say anything to the committee. . . . I lived there in town but knew nothing of what they were doing. I saw these different men from time to time to look at them—Jarvis, Bounds, Carroll and the rest of them. I might have known that they were going ahead and procuring the right of way. I paid my assessment and at the time I paid it I knew they were going to use it for something. When I paid that, I did not say anything to them then that I did not consider myself liable on that agreement. I never had anything to say to the committee in any way, form or fashion, nor to any of them. I think they did call on me to pay my part of the shortage."

Jarvis testified as follows: "The money received by the right of way committee on account of those two notes was loaned to the parties sign-

ing those notes for the purpose of discharging the obligation of the right of way committee. I think I spoke to Mr. J. V. Matson several times, more than once, in regard to attending the meetings of this committee (right of way committee), but I now call to mind especially one time that I told Mr. Matson in the evening that the committee was going to meet. The time was in the evening, probably 2 o'clock, in the front of the First National Bank, when I informed Mr. Matson, and he told me that he was so busy that he could not attend, or did not expect to attend, these meetings at all when he signed the bond, but for me to go ahead and to represent him, and whatever the committee done, whatever we done, that he would acquiesce in it and that it would be satisfactory to him. The meeting that I spoke to him about at that time was after the railroad had come into or had been running into Hubbard (City), and at the time the means was about exhausted that was in hand, and if my memory serves me right it was in July or August, 1903, possibly July. It was some time after the road had been completed so as to permit trains to run over it. I know that it was in the summertime because those large windows in front of the bank are raised up in the summertime to give ventilation and air, and he was sitting in one of those windows when I was talking to him. I don't remember how many conversations, prior to this one, that I had with Mr. Matson from the time the contract was signed up by the twelve parties whose names appear on it. One reason why that impressed my mind is that I went immediately from the conversation with Mr. Matson to the committee and so informed the committee of Mr. Matson's message. I don't remember now of any definite conversation with him before that time. I don't think Mr. Matson ever did attend any of the committee meetings. I never learned at any time through Mr. Matson himself of any contention on the part of Mr. J. V. Matson that he was not liable on account of this agreement signed by him with the rest of us. What I found out was at the meetings of the committee. I never heard Mr. Matson say anything at all about it until we entered suit, never heard him say anything about being dissatisfied himself. I said that I never heard anything about Mr. Matson claiming that he was not liable on that bond except through the committeemen. Those committee meetings at which I heard that, were along towards the latter part of the committee meetings and after the railroad had been completed into the town, when funds were running short to meet the obligations of the committee and when we were trying to raise them; and some of them probably, I don't remember who it was, said that Mr. Matson claimed that he did not regard himself as liable, something of the sort. He did not claim to me that the bond had been changed after he signed it."

In this connection the appellant Matson testified: "I do remember of having a conversation with Mr. Jarvis at one time about going to the committee meeting. We had a conversation with reference to the right of way, with reference to procuring the right of way. In that conversation I just told him to go ahead and do the best he could that I would stay with him; . . . that was about the substance of my

reply to him. I don't remember what all he did say. That was before
I learned that Putman's signature had been modified. I had a conversa-
tion with Jarvis before I learned about Putman's modification. It was
after I had the conversation with Mr. Jarvis that I learned that Mr.
Clonch's name had been erased." Again, referring to the conversation
with Jarvis, he said: "I remember these two following questions being
propounded to me on the other trial and their answers: 'Q   Do you say
it did or did not happen? A.  I don't remember. If it happened I
can not recall it.  I remember talking at one time about the matter.
I don't remember the place. I told him to go ahead and do the best
he could and I would stay with him.'"

W. R. Bounds testified: "I remember the conversation between me
and Matson at the oil mill after I had signed this article of agreement.
Matson came up to the mill where I was at the office of the mill, and
as he approached me he said, 'We have played hell. We have bought
us a railroad. If you had not signed that bond, I would not; but when
I saw old W. R.'s name on it I stuck mine right to it,' or words to that
effect. That was on the evening of the signing of the bond, late in
the evening getting along towards quitting time. I remember having
another conversation with Mr. Matson later on concerning his consult-
ing about his liability on this agreement. He came to me and spoke
of some irregularities that had, in some manner, taken place in the
manufacture or make-up of this bond, and said, 'We can both get out
of it,' and asked me to go with him and get out of it with him. That
was in the crushing season of the oil mill, either right in the first of
January at that time or a little later while I was manager and secretary
of the oil mill during the season of 1902-1903, and it was while I was
there that he approached me on this subject, and it was between the
signing of the bond of October 21, 1902, the date of the bond, and, say,
the 1st of April, 1903, because that oil mill season don't extend any
further. I was there at the oil mill. I declined to go in with him.
That was while I was working at the oil mill that Mr. Matson came
and had the conversation with me in which he said that he had signed
the bond; and afterwards he had another conversation in which he
told me that he had found out that he was not liable on the bond. That
occurred between the time the bond was signed and the 1st of April,
1903. I fix that time by my working at the oil mill. He told me he
could repudiate it, and told me for us to go in together. He never has
done it until we brought the suit. He did not refuse to pay it. It was
after that conversation that I borrowed that money from Mr. Jarvis."
When asked if he had made the statements imputed to him by the wit-
ness Bounds, Matson said, in effect, that he did not remember to have
made either of said statements.

We are of the opinion that in the state of the evidence it can not be
said that it was conclusively shown that the appellant Matson neither
consented to the erasure of Clonch's name from the contract upon which
this suit is based, nor ratified the same after such erasure; and unless
it was conclusively so shown, the giving of the special charge in question

would have been reversible error. It will be noted that according to the testimony of both Clonch and Bounds, quoted above, Matson knew as early as March or April, 1903, that Clonch's name had been erased from the right of way contract or bond, and that according to the testimony of plaintiff Jarvis, Matson, when being importuned by Jarvis in the summer of 1903, probably in July or August, to attend a meeting of the right of way committee, at which means and methods were being devised to raise money to discharge the right of way obligation, informed Jarvis that he could not or did not intend to attend said meetings but that for him, Jarvis, to go ahead and represent him, Matson, at said meeting, and that whatever the committee did would be satisfactory to him and that he would acquiesce in it. Under this testimony the jury would have been warranted in finding that, even though Matson did not know of the erasure of Clonch's name from the right of way agreement at the time such erasure was made and did not then consent thereto, yet afterwards with full knowledge thereof he consented to the alteration or ratified the same.

Had a special charge been asked and refused, submitting the issue of such consent or ratification, its refusal would have been error of which Matson could have justly complained. But his theory seems to have been that want of consent on his part to the erasure of Clonch's name, before he acquired knowledge of such erasure, was conclusively established by the evidence which, perhaps, is correct, and that consent to or ratification of the erasure after he acquired knowledge thereof was not raised by the evidence, and hence no special charge submitting the latter question was requested. In this theory of the case we think he was mistaken, and that he is now in no position to insist upon a reversal upon this phase of the case.

The second assignment complains of the court's refusal to charge the jury as requested by the defendants, to the effect that, if the written instrument described in plaintiff's petition was signed by W. A. Putman and that at the time he signed his name thereto there was no qualification placed thereon; and, further, that after the said Putman signed his name thereto J. V. Matson signed his name to the same, and that after said J. V. Matson signed his name to the same the said W. A. Putman, with the consent of the obligee in said bond or his agent, qualified his obligation on said bond by adding the words after his name, "to the extent of one hundred dollars," and that the same was done without the consent or knowledge of the said J. V. Matson; and that afterwards J. M. Carroll signed said obligation in the place of the said J. E. Clonch, whose name had been erased therefrom, and that at the time the said J. M. Carroll signed the same he was not informed that said qualification after the name of W. A. Putman had been put on said instrument after the signing thereof by the said J. V. Matson, then said instrument would not be binding upon the said J. M. Carroll and you will find a verdict in his favor and so say. There was no error in refusing this charge, for the reason that the issues embodied therein were fairly and sufficiently submitted in the court's general charge.

By the third assignment it is contended that the verdict of the jury in placing the total amount unpaid on the $4000 alleged to have been advanced by plaintiff, at $1389.75, thereby making and finding the aliquot share due by each defendant to be $277.95, is contrary to the evidence and excessive; that a correct calculation of the interest on the amounts advanced by plaintiff aggregating said sum of $4000 at the rate of six per cent per annum shows the total balance due thereon to be $1280.74. The contention that the balance due did not equal the amount found by the jury is doubtless correct. It was so admitted by the plaintiff but attributed to and shown to be a miscalculation on the part of the jury in arriving at their verdict, and a remittitur filed reducing the amount for which judgment was entered, to the amount claimed by appellants under this assignment to have been shown to be due. This corrected the error in the jury's finding in this particular, and the court did not err in rendering judgment for the amount so shown to be due.

Nor did the court err in entering judgment upon the remittitur filed by the plaintiff. The remittitur having been made for the purpose of correcting an error in the calculation made by the jury, based on the undisputed facts, the same was permissible, and the judgment entered in accordance therewith was correct under the decisions in this State.

At the request of the plaintiff Jarvis, the court instructed the jury as follows: "You are instructed that in the event you should find for the plaintiff against any of the defendants, Bounds, Matson, Carroll and Morgan, you will arrive at the amount of your verdict by the following process: You will first ascertain the aggregate amount of the payments made to the plaintiff E. Jarvis on account of said $4000 claimed by him to have been loaned to said right of way committee prior to the 22nd day of August, 1905, the day on which said suit was filed, deducting the aggregate amount of such credits from said sum of $4000, then deducting from said balance the sum of $100 paid by the defendant W. A. Putman, you will then prorate the amount of the balance due on account of said $4000 on August 22, 1905, between the plaintiff and all of the defendants then liable for said amount; and you are further instructed that as to said defendants M. P. Harwood, Mrs. Myrtle Davis, Lee Frisby, J. M. Peden, J. R. Jones, Jr., and W. A. Putman, you will find your verdict in their favor; and as to the other defendants that you may find against, you will calculate interest on the pro rata part of the balance due by each of them on account of said $4000 from August 22, 1905, at the rate of six per cent to this date, stating the amount in your verdict that you may find against each of the defendants, naming them." This charge is objected to on the grounds: (1) That "it is upon the weight of the evidence and calculated to mislead the jury and indicate to the jury that in the mind of the court the plaintiff had a right to recover; (2) that it is erroneous in that it directs the jury to deduct only the sum of one hundred dollars on account of W. A. Putman, when, according to the undisputed evidence, said Putman, if liable on said bond, was liable not only for a hundred dollars but also for interest thereon." We are of the opinion that neither of

these objections to the charge constitute reversible error. The charge is not upon the weight of the evidence; and there is no testimony pointed out, nor have we discovered any, showing when the $100 agreed to be paid by Putman was in fact paid. It does appear that it was paid after the suit was filed, but how long after, whether one day or one year, was not shown. There was, therefore, no basis upon which by calculation the amount of interest for which Putman may have been liable, could be ascertained.

But if the evidence was sufficient to enable the jury to arrive at the amount of interest due by Putman, still the charge complained of was not, in our opinion, affirmative error, but seems to be correct as far as it goes, and if the defendants desired to more fully present the question to which it related, that is, if they desired to have the jury told that in arriving at the amount unpaid of the money advanced by the plaintiff they should, in dealing with the amount paid by Putman, charge interest thereon, a correct charge to that effect should have been prepared and requested.

Nor did the court err in failing to instruct the jury that in arriving at the amount each of the defendants was liable for they should take into account the pro rata share charged against S. R. Boyd, one of the signers of the right of way agreement. The undisputed evidence showed that Boyd died wholly insolvent before the institution of this suit; that nothing could be realized from his estate, and in such case his pro rata share of the amount due the plaintiff in a suit for contribution must be borne ratably by the other signers of said agreement.

The eighth, tenth, seventh (eighth in the record), and twelfth assignments of error are each submitted as propositions. Neither of them specifies or points out with sufficient definiteness the particular error of the court sought to be presented for review, nor is either accompanied by a sufficient statement as required by the rules to enable us to decide the question involved without a resort to the record. None of the facts upon which a decision of the question turns are given in the statement subjoined to the assignment. Under the eighth, the statement made is: "Same as under twelfth assignment, except that the charge refers to J. M. Carroll instead of T. C. Morgan. The facts were as stated in said charge. See statement of facts, page —, this brief, p. —." Under the tenth the statement is: "The special charge requested and refused is as follows": (Then follows the special charge covering more than a page of the brief.) The statement under the seventh assignment (eighth in the record), is as follows: "The special charge requested and refused is at Tr., pp. 62 and 63, and is the same as that copied under tenth assignment of error, this brief, p. —, except that it referred to J. M. Carroll instead of T. C. Morgan." The statement under the twelfth assignment is simply a copy of the charge the refusal of which is complained of. This manner of briefing is not in accordance with the rules upon the subject, and the assignments are not entitled to consideration. A reading of the court's general charge, however, has led us to the con-

clusion that the special charges refused were, in so far as they were applicable to the facts, sufficiently covered by the second and third paragraphs of said charge, and that the appellants have suffered no substantial injury, if any at all, by the refusal of their special charges.

The assignments not discussed have either been disposed of adversely to the contention of appellants by what has already been said, or the special charges to which they relate, in so far as said charges contained correct propositions of law applicable to the facts, were covered by the court's main charge.

The judgment of the court below is therefore affirmed.

*Affirmed.*

Writ of error refused.